IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THOMAS WHEELER,<br><br>　　　　　　　Plaintiff,<br>v.<br><br>ALLSTATE INSURANCE COMPANY,<br>ALLSTATE INDEMNITY COMPANY and<br>DOES I-III,<br>　　　　　　　Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br><br>Case No. 2:12-cv-193-BCW<br><br>Magistrate Judge Brooke C. Wells |

This matter is before the court on Defendant Allstate Insurance Company and Allstate Indemnity Company's (hereinafter collectively referred to as "Allstate") Motion for Summary Judgement[1] and Plaintiff Thomas Wheeler's Motion for Partial Summary Judgment.[2]  On February 27, 2015, the court held a hearing on these motions.[3]  At the hearing, Mr. Wheeler was represented by Ronald Madson and Summer Young, and Allstate was represented by Rafael A. Seminario. Before the hearing, the court carefully considered the memoranda and other materials submitted by the parties.  Since taking the matter under advisement,[4] the court has further considered the law and facts related to these motions.  For the reasons set forth more fully below, the court GRANTS Allstate's Motion for Summary Judgment and DENIES Plaintiff's Motion for Partial Summary Judgment.

---

[1] Docket no. 37.
[2] Docket no. 38.
[3] Docket no. 52.
[4] *Id.*

# BACKGROUND[5]

Sometime during the early months of 2011, a sink located in the lower level of Plaintiff Thomas Wheeler's ("Plaintiff") cabin in Duck Creek, Utah began to leak.  The leak was not detected immediately and the cabin suffered a great deal of damage.  The dispute in this lawsuit is whether or not Plaintiff's homeowners insurance policy should cover any of the damage to Plaintiff's cabin and whether or not the insurance company handled Plaintiff's claim in good faith.

Plaintiff owns a seasonal cabin in Duck Creek, Utah.   During the winter months of 2010-2011, Plaintiff's cabin was unoccupied and had not been visited.  In April, 2011, Ms. Lila Harper, the wife of one of Plaintiff's employees and her children were in the area of Plaintiff's cabin on a walk and decided to stop by the cabin to get some water to drink.  Upon entering the cabin, Ms. Harper smelled a "misty kind of smell."   Her children went downstairs and "came up screaming that there was water, water.  Mom, there's water everywhere."  Ms. Harper then further investigated and went down to the basement of the cabin.  In her deposition she described seeing:

> Probably four or five inches of water, and it was dark. I had left the lights off.  And really just water.  There's nothing really to notice except I followed where I could hear the water spraying out. And so I walked down across the family room downstairs to the wet bar.
>
> And water was—you could see the cabinet had busted, either from the pressure or moisture or whatever from being so damp.  It had just broken off and was hanging on its hinges, and water was spraying out everywhere.[6]

---

[5] All facts included in this section were taken from the briefs and exhibits filed in conjunction with Plaintiff's and Defendants' Motions for Summary Judgment.  *See* docket nos. 37, 38, 42, 43, 46 and 47.

[6] Exh. 4, docket no. 37 at p. 10.

Ms. Harper then called her husband to report the problem at Plaintiff's cabin.  Mr. Harper directed his wife to call Dirk Nelson, who works as a contractor for Plaintiff.  Mr. Nelson directed Ms. Harper on how to turn the water off.

Mr. Nelson then informed Plaintiff about the situation at the cabin. One witness, Mr. Brandon Harris, who later observed conditions at the cabin stated that the smell was horrible, the mold was so bad that he had to kick the back door to get in because the front door would not open. Upon entering the cabin, he noticed that the fan blades on the ceiling fan on the main level were sagging so far they were touching the lights and the "wood floor was so bad you literally were tripping on it."  The mold on the log walls was "horrific." He had never seen a mold problem as bad as in Plaintiff's cabin.  Mr. Harris further testified at his deposition that the damage was so extensive because usually the water will run for a day or two and "someone will catch the water...[n]ever like this."

Thereafter, Plaintiff's assistant Emily York called Allstate (who insured Plaintiff's cabin) to report the problem.  According to the "First Notice of Loss Snapshot" dated April 19, 2011, Ms. York's description of the loss was recorded by Allstate as follows:  "Water pipe under bar broke. Water leaking in basement of cabin.  Smell of mold.  Not sure of damage."  The Loss Snapshot also notes that in response to the question, "when was the last time anyone was at the property?" Ms. York stated "more than a month."  During the call to Allstate, the adjuster handling the call informed Ms. York that based on the information she was reporting, there would probably be no coverage for the loss.

Coincidentally, about the same time Plaintiff was informed by those in Duck Creek that his cabin had been damaged by water, Plaintiff noticed that his water bills had shown a dramatic increase in the amount of water the unoccupied cabin was using.

The Kane County Water Conservancy District water records show measurements for Plaintiff's water usage at the cabin as follows:

| Billing Period | Water Usage in Units (Each Unit = 1,000 gallons) |
|---|---|
| 12/20/2010 to 1/19/2011 | 0 |
| 1/19/2011 to 2/17/2011 | 8 |
| 2/17/2011 to 3/23/2011 | 35 |
| 3/23/2011 to 4/18/2011 | 29 |
| 4/18/2011 to 5/18/2011 | 1 |
| 5/18/2011 to 6/20/2011 | 0 |

Plaintiff testified in his deposition that "[t]he first bill had a little bit of higher number to it, but I have my bills just automatically paid from the office so somebody didn't pay attention.  We are talking $15 compared to, like $30.  That isn't that much of a difference.  But the next bill was, like, $90."[7]

After Ms. York spoke with Allstate, and learning the loss was most likely not covered, Allstate nevertheless sent an outside adjuster, Mr. Robert Holland to inspect the property. According to Mr. Nelson who was with Mr. Holland on the day of the inspection, the adjuster spent "ten minutes tops" at the cabin and "took like two or three pictures and left."[8]  Nevertheless, Mr. Holland's log, read into the record during his deposition, stated as follows:

> Inspected loss.  Water damage has been leaking for several months causing extensive mold damage throughout the house.  Mold upstairs on every wall and ceiling in home.  Explained to contractor that met me on loss, Dirk Nelson, long-term water damage and loss was not covered.  ServPro was out on loss and assessing the damage.  Mold damage is the main loss here with several tens of

---

[7] Exh. 2, Allstate's Mot. For Summary Judgment, at p. 10.  Kane County's records included as exhibits to Allstate's Motion for Summary Judgment shows in actuality that Plaintiff's water bill balance was $15.00 for January 2011, $31.00 for February, 2011, $93.75 for March, 2011 and $78.75 for April, 2011. Exh. 13, docket no. 37 at p. 7.
[8] Exh. 10, docket no. 37 at p. 26.

thousands worth of mold for remediation. Nobody has been in the home since the first of January.  Will send out denial letter and close the file.[9]

Mr. Nelson further testified during these proceedings that as part of his hired responsibilities to winterize the cabin, he used to turn the water to the cabin completely off to prevent freezing pipes. However, he stopped that practice when it became difficult for Plaintiff to find the water valve to turn the water back on after a heavy snow fall.  So Mr. Nelson's most current practice was to leave the water and heat on in the cabin to prevent the freezing of pipes.

At all times relevant to the underlying dispute, the cabin was insured under an Allstate Insurance Company Deluxe Homeowners Policy.  The policy provisions in dispute read as follows:

Losses We Do NOT Cover Under Coverage A, Coverage B, and Coverage C

A.  We do not cover loss to the property...consisting of or caused by the following:
    3.  Seepage, meaning continuous or repeated seepage or leakage over a period of weeks, months or years, of water steam or fuel:
        a.  from a plumbing, heating, air conditioning or automatic fire protection system or from within a domestic appliance; or
        b.  from, within, or around any plumbing fixtures, including but not limited to shower stalls, shower baths, tub installations, sinks, or other fixtures designed for the use of water or steam.[10]

    7.  a) wear and tear, aging, marring, scratching, deterioration, inherent vice, or latent defect;
        d) rust or corrosion;

        If any of a) through h) cause the sudden and accidental escape of water or steam from a plumbing, heating, or air conditioning system, household appliance or fire protective sprinkler system within your dwelling, we cover the direct physical damage caused by the water or steam.  If loss to covered property is caused by water or steam not otherwise excluded, we will cover the cost of tearing out and replacing any part of your dwelling necessary to repair the system or appliance.  This does not include damage to the defective system or appliance from which the water escaped.[11]

---

[9] Exh. 9, docket no. 37 at p. 24.
[10] This section can be described as "exclusionary." It shall hereinafter be referred to as "Section 3" or the "exclusion."
[11] This section can be described as an exception to an exclusion.  It shall hereinafter be referred to as "Section 7" or the "exception to the exclusion."

On April 26, 2011, Allstate sent Plaintiff a letter denying his claim citing the seepage exclusion as the basis for the decision.[12]

**Expert Reports**

    **1.**        **Priscilla Stimpson**-Allstate's Expert

Ms. Stimpson was asked by Allstate to "address whether Allstate Insurance Company acted reasonably and in good faith in their denial of Thomas Wheeler's claim for water and mold damage to his cabin..."  In forming this opinion and upon review of the policy language at issue in this case, Ms. Stimpson stated "[b]ased on my experience in the insurance industry and in handling homeowner's claims for decades, words and phrases in Mr. Wheeler's policy are common to the majority of homeowner's policies that are marketed by various insurance companies.  This includes Exclusion 3 found in Mr. Wheeler's insurance policy which excludes coverage for seepage and leakage.  The phrase "continuous or repeated seepage or leakage that occurs over weeks, months, or years" found in Exclusion 3 of Mr. Wheeler's homeowners policy is common in the insurance industry."

Further, Ms. Stimpson opined as to how Exclusion 3 of the Insurance policy can be reconciled with the exception to Exclusion 7 which Plaintiff argues would provide him with coverage for this loss.  According to Ms. Stimpson:

> Based on the length of time the seepage or leakage continued, as well as the extent of the mold and other damage, the exception to Exclusion 7 does not apply. Damage from moisture, humidity and mold was not sudden and accidental.  The clear meaning when Exclusions 3 is read together with the exception to Exclusion 7 is that loss can start as a sudden and accidental escape of water, but if ignored and allowed to continue, the resulting damage is NOT sudden and accidental.  A failed valve may cause a sudden and accidental escape of water, but if the water continues to flow for "weeks, months, or years" the resulting damage comes from "continuous or repeated seepage or leakage over weeks, months or years" and is

---

[12] Exh. 11, docket no. 37.

therefore "otherwise excluded" under Exclusion 3 which excludes "continuous or repeated seepage or leakage over weeks, months, or years."[13]

Therefore, Ms. Stimpson opined, "[t]he exception to Exclusion 7 does not apply to the loss and damage at the Wheeler cabin that was discovered by Mrs. Harper on 4-19-11 because (1) the loss occurred over a period of weeks, months, or years; and (2)  the loss was otherwise excluded under Exclusion 3."  Further, "[t]he 4-18-2011 meter reading verifies continuous leakage of water between no later than mid-February and at least 4-18-2011, a period of at least two months."

Ms. Stimpson also explained in her report that "[a] type of hazard not covered under homeowners policies are "morale hazards" which deal with "attitude rather than intention.  It deals with loss or damage that occurs and/or is increased because of a less-than-conscientious attitude on the part of the homeowner toward the proper maintenance and care of the property insured."  Therefore, "continuous or repeated seepage or leakage of water from a plumbing system is considered a morale hazard because the damage and/or the extent of loss can be limited or prevented entirely through proper maintenance and attentive care of the property insured."  However, in her deposition Ms. Stimpson agreed with Plaintiff's counsel's question that any damage that would have occurred during the first 13 days would be covered under Plaintiff's policy.  However, Ms. Stimpson qualified this answer by stating afterwards "[i]f there way to determine [damages] but there is not."

Lastly, Ms. Stimpon opined that "[t]he outside adjuster was well-versed in the homeowner's coverage.  He was very familiar with Exclusion 3...which eliminated coverage under the policy for damage or loss due to 'continuous or repeated seepage or leakage.'  There was no need for him to determine the specific source or cause of the leak because of the all-encompassing nature of the 'continuous or repeated seepage or leakage exclusion.

---

[13] Exh. 21, Allstate's M. for Summ. Judgment at p. 9.

2. **Harvey Irby, Gifford Consulting Group,** Plaintiff's Expert[14]

On May 29, 2014, Mr. Irby opined as to causation and consequences of the flood at Plaintiff's cabin. According to Mr. Irby's report, "[t]he flood was the direct result of a failed angle stop valve located under a basement sink." Mr. Irby further concluded that "the failure would not have resulted in a limited water flow, but rather would have resulted in an unrestricted water flow of not less than 17 gallons per minute...[and] standing water must be removed in no more than 3 days unless irreparable damage is effected due to water invading expansive or absorbing materials." Thus, according to Mr. Irby, "the water damage to walls, cabinets, and other water absorbing materials was beyond repair within less than a week."

On August 6, 2014, Mr. Irby was deposed. At his deposition, Mr. Irby was shown the actual water usage records from Kane County. Upon review and consideration, Mr. Irby recalculated his figures on water loss. Mr. Irby reduced the amount of water loss from his report and stated that the loss was approximately three quarters of a gallon per minute. Thus, his original opinions on water loss were incorrect by over 10 times. However, Mr. Irby stated that the amount of water accumulation and possible damage would still be the same.

3. **Jim Leatzow-**Plaintiff's Expert

Mr. Leatzow was retained by Plaintiff to provide an analysis and evaluation of Allstate's handling, investigation and adjusting of Plaintiff's homeowner's insurance policy and subsequent denial of Plaintiff's claim. In relevant part, Mr. Leathzow concluded that

> Allstate acted unreasonably by beginning their investigation from a position of prematurely denying coverage first via file notes made by their inside adjuster with scant information, followed by an overt decision to again prematurely deny the claim as offered in a statement made by Allstate's outside adjuster to the insured's on-site

---

[14] The Court notes that Plaintiff had an additional expert from Gifford Consulting Group, Mr. Don Gifford who was deposed before Mr. Irby. Upon review of Mr. Gifford's deposition transcript contained in the materials provided in conjunction with these motions, the Court concludes that Mr. Gifford's deposition and opinions are not material to the Court's decision, therefore the Court omitted discussion of Mr. Gifford's opinion.

representative, prior to even entering and inspecting the damaged property. Allstate further acted unreasonably by then relying upon ambiguous policy language as the means for denying coverage for their insured Thomas Wheeler.[15]

Therefore, Mr. Leatrow opined that the policy language was ambiguous and Allstate failed to evaluate Plaintiff's claim adequately. Therefore, according to Mr. Leatrow, Allstate acted in bad faith.

## STANDARD OF REVIEW MOTIONS FOR SUMMARY JUDGMENT

Under Rule 56 of the Federal Rules of Civil Procedure, a party is entitled to summary judgment if the party can demonstrate through "particular materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations…admissions, interrogatory answers, or other materials" that there is no genuine issue as to any material fact.[16] A genuine issue of material fact exists when, after viewing the record and making all reasonable inferences in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-moving party.[17]

Moreover, the opposing party's response must set forth specific facts showing a genuine issue for trial, and it "must do more than simply show that there is some metaphysical doubt as to the material facts."[18] "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient."[19] Thus, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"[20]

---

[15] Exh. 5, docket no. 43.
[16] *See* F.R.C.P. 56(c).
[17] *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007)("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.")(internal citations and quotations omitted).
[18] *Matushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).
[19] *Anderson*, 477 U.S. at 252.
[20] *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)(quoting F.RC.P. 1).

## ANALYSIS

Plaintiff's complaint alleges two causes of action:  (1) Breach of Contract and (2) Breach of Implied Covenant of Good Faith and Fair Dealing.  Plaintiff moves for summary judgment on the breach of contract claim and Allstate moves for summary judgment on both claims.  To be clear, as indicated at oral argument by Plaintiff's counsel, Plaintiff is only seeking relief for the damage caused during the first 3 days of the leak and is not requesting any damages caused by mold.

### A.  Breach of Contract

"A federal court sitting in diversity applies the substantive law...of the forum state."[21] Accordingly, under Utah law, "[w]e construe insurance contracts by considering their meaning to a person of ordinary intelligence and understanding….in accordance with the usual and natural meaning of the words, in the light of existing circumstances, including the purpose of the policy."[22] As Judge Jenkins has explained:[23]

> Insurance policies are generally interpreted according to rules of contract interpretation."[24] Because "an insurance policy is a classic example of an adhesion contract," Utah courts have long held that "'insurance policies should be construed liberally in favor of the insured and their beneficiaries so as to promote and not defeat the purposes of insurance.'"[25] "It follows that ambiguous or uncertain language in an insurance contract that is fairly susceptible to different interpretations should be construed in favor of coverage" and "provisions that limit or exclude coverage should be strictly construed against the insurer."[26]  In strictly construing exclusions, we give them effect only when they "use language which clearly and unmistakably communicates to the insured the specific circumstances under which the expected coverage will not be provided."[27]

---

[21] *Barrett v. Tallon*, 30 F.3d 1296, 1300 (10th Cir. 1994).

[22] *Lopez v. United Auto Ins. Co.,* 2012 UT 10 ¶ 17, 274 P.3d 897, 902 (quoting *Doctor's Co. v. Drezga*, 2009 UT 60, ¶ 12, 218 P.3d 598, 603)).

[23] *Cincinnati Insurance Company v. AMSCO Windows*, 921 F.Supp. 1226, 1235 (citing *Fire Ins. Exchange v. Oltmanns*, 2012 UT App. 230, ¶ 6, 285 P.3d 802, 805).

[24] *Utah Farm Bureau Ins. Co. v. Crook*, 1999 UT 47,

[25] *United States Fidelity & Guar. Co. v. Sandt*, 854 P.2d 519, 521-522 (Utah 1993)(quoting *Richards v. Standard Acc. Ins. Co.*, 200 P.1017, 1020)(1921)).

[26] *Id*. at 522-23.

[27] *Utah Farm Bureau Ins. Co.*, at ¶ 5 (citations and internal quotation marks omitted).

In the instant case, the Court must make two determinations in deciding whether Allstate as a matter of law breached the insurance contract in failing to cover Plaintiff's loss.  First, is Section 3 ambiguous? If not, which section of the insurance policy applies to Plaintiff's loss?  Is it the exclusion under Section 3 as Allstate argues, or an exception under Section 7 as Plaintiff argues?

As to the issue of ambiguity, "[c]ontract language may be ambiguous if it is unclear, omits terms, or if the terms used to express the intention of the parties may be understood to have two or more plausible meanings."[28]  Moreover, "[c]ontract construction remains a question of law even though the parties may disagree about the meaning of the contract even though one party may claim that the contract is ambiguous."[29]

Here, Plaintiff argues that Section 3 is ambiguous.  Allstate disagrees.  Specifically, the parties have presented arguments on the meaning of the terms "seepage," "leakage" and "weeks." Upon review of the contract language and construing it liberally in Plaintiff's favor, the Court finds that the terms as used in Plaintiff's contract are clear and not ambiguous.  In making this determination, the Court relies upon the plain, ordinary meaning of the language in the contract.  The Court disagrees with Plaintiff's attempt to persuade the Court to construe the language in a more subtle, fine-tuned manner that favors Plaintiff's recovery and ignores the contract's plain language.

Counsel for Allstate at oral argument described the insurance contract in the following manner.

> ...most of the time water damage is covered.  If you were to go home and you find that your washing machine is leaking and you call up the insurance company, they will come and clear all of it.  They will take care of it.  Most of the time that's what happens.  The exception, which is what we find ourselves in, is when you have a homeowner that isn't in a home for a period of three, four, five months.  That's not the typical customer.  That's not someone that is an average homeowner.  That's the

---

[28] *Village Inn Apartments v. State Farm Fire & Casualty Co.*, 790 P.2d 581, 583, (Utah Ct. App. 1990)(internal citations omitted).
[29] *Gomez v. American Electrical Power Service Corp.*, 726 F.2d 649, 651-52 (10th Cir. 1984).

person that finds themselves in this small exception....[t]he only time it's not covered, the only time the seepage comes in is when we're dealing with a long term loss.[30]

The Court agrees with counsel's synopsis of the coverage and believes it to be in line with the plain meaning of the insurance policy.  Additionally, this interpretation is in line with authority from at least one Court in this district.   In *American Concept Insurance v. Jones*[31] the Court found similar policy language that stated "...we do not insure loss:  caused by: constant or repeated seepage or leakage of water...over a period of weeks, months or years from within a plumbing...system." not to be ambiguous. [32]

In *American Concept*, Plaintiffs constructed a home in Ivins, Utah.[33]  When the construction was substantially completed, Plaintiffs began noticing cracking and settling of the interior walls and concrete floor slabs.[34]  A few years later, the damage to the Plaintiff's home was severe enough that they hired an outside company to evaluate the cause of the damage.[35]  The outside evaluator's report revealed that the "home settlement was caused by 'sustained saturation' of the soil under the home 'due to leakage from a 3 inch sewer drain line' which likely began shortly after construction of the home and continued 'undetected for the [next] two years.'"[36]  In finding the exclusion similar to the exclusion in instant case not to provide coverage to Plaintiff's home, the Court reasoned that "the undisputed facts reveal the damage to the Joneses' home was 'caused by constant or repeated seepage or leakage of water...over a period of weeks, months or years from within a plumbing system."[37]  Thus, the Court found no ambiguity in a policy that used the same terms as in Plaintiff's contract based on similar facts where water had been leaking for an extended period of time before it

---

[30] Docket no. 52.
[31] 935 F.Supp.1220, 1226 (D. Utah 1996).
[32] *Id.*
[33] *Id.* at 1223.
[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id.*

was discovered.  Therefore, based upon the plain language of the insurance policy, as well as case

law from this district, the Court finds Section 3 is not fairly susceptible to the interpretation Plaintiff

suggests.   Accordingly, the insurance policy is not ambiguous.

Having found no ambiguity, the Court now moves on to Plaintiff's argument that the Court

should construe what happened at his cabin as "sudden an accidental loss" which according to

Plaintiff, would be covered under an exception contained in Section 7 of Plaintiff's policy.  To be

sure, Plaintiff even frames the issue he believes the Court should rule on as "[t]he issue before this

court is narrowly as to whether the release of water was 'sudden.'"[38]  As support for this argument,

Plaintiff cites *Quaker State Minit-Lube, Inc. v. Fireman's Fund Insurance Company* where the Court

construed the meaning of the term "sudden and accidental" to preclude "the pattern of frequent, even

routine occurrences involving the release or discharge of hazardous waste upon or into the

ground."[39]  Upon review of the *Quaker State* case, which was later affirmed by the 10th Circuit[40] the

Court finds its facts easily distinguishable and its holding not dispositive to the instant case.

*Quaker State* involved a dispute over whether an insurance company should be responsible

for costs associated with cleaning up an oil disposal site in Salt Lake City.[41]  In short, Plaintiff,

owned and operated a number of automobile service centers which provide simple vehicle

maintenance, including engine oil changes.[42]  The used engine oil was then sold to re-refiners and

recyclers.[43]  One of those companies, Ekotek operated a facility in Salt Lake City where it

reprocessed the used oil into lubricating products for resale.[44]  However, unbeknownst to Plaintiff,

unknown amounts of used oils and other pollutants were released into the ground at the Ekotek

---

[38] Plaintiff's M. for Partial Sum. J. at p. 10.
[39] 868 F.Supp. 1278 (D. Utah 1994) *aff'd Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.,* 52 F.3d 1522, 1526
(10th Cir. 1995).
[40] *Quaker State, Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522 (10th Cir. 1995).
[41] *Id.*
[42] *Id.* at 1254.
[43] *Id.*
[44] *Id.*

facility.[45]  The damage was so extensive that the Environmental Protection Agency became involved

in the remediation of the site pursuant to the Comprehensive Environmental Response Compensation

and Liability Act of 1980.[46]  Under the CERCLA, the EPA pursued the costs for this remediation

work and Plaintiff brought suit against its insurance companies for denying coverage because

Quaker State had "…not engaged in the knowing or intentional pollution of the [site][and Quaker

State's] strict statutory liability…for response and clean-up costs cannot fall within any exclusion or

limitation of coverage under the insurance policies purchased from the defendants…"[47] Both the

District of Utah and the 10th Circuit found the insurance company properly denied Plaintiff's claim.

      Here, it is easy to see that the *Quaker State* case is not analogous to Plaintiff's claims for loss

to his cabin.  First, the policy involved in *Quaker State* was not a homeowner's policy but

comprehensive general liability and primary garage liability coverage.  In addition, the policy

language in *Quaker* State differed significantly from the language at issue in the present case.[48]

Moreover, the damage that was caused unbeknownst to the Plaintiff did not involve water damage

but rather damage to soil from pollutants.   Furthermore, as explained in more detail below, the

Court finds  Section 3 excludes coverage of Plaintiff's claim and therefore Section 7 does not apply.

Therefore, there is no need as Plaintiff suggests, to interpret whether the loss was "sudden."

      Here, the plain reading of Section 7 demonstrates that the exception is triggered only if no

other exclusion applies.  In other words, the Court agrees with Ms. Stimpson's analysis of the

contract where she stated: "[t]he clear meaning when Exclusions 3 is read together with the

exception to Exclusion 7 is that loss can start as a sudden and accidental escape of water, but if

---

[45] *Id*.
[46] *Id*. at 1525.
[47] *Quaker State*, 868 F.Supp. 1278, 1286.
[48] The language at issue in *Quaker State* states in relevant part, "[B]odily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gasses, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental." *Quaker State*, 52 F.3d 1522, at 1526.

ignored and allowed to continue, the resulting damage is NOT sudden and accidental." The Court finds this determination to be supported by both the plain meaning of the policy and case law from other jurisdictions.

The Court finds the following cases to be persuasive and used them as guidance in reaching its conclusion. In these cases, language similar to the exclusionary language contained in Exclusion 3 of Plaintiff's insurance policy was interpreted against language similar to Exception 7 of Plaintiff's policy.

In *Schwartzenfeld v. Nationwide Mutual Fire Insurance Company*,[49] "[p]laintiffs noticed some water staining to their dining room's plaster ceiling below the master bathroom and the foyer's plaster ceiling below a bathroom located off the second floor hallway."[50] That same day, Plaintiffs brought in a contractor who opened the ceilings and "determined that the source of the water was the upstairs bathtubs or toilets."[51] Plaintiffs then informed their insurance company and the insurance company's adjuster inspected the water damage areas the same day.[52] "Before leaving the home, the adjuster advised plaintiffs that their claim would be denied because, although the ceilings had just then sustained damage, it was his conclusion that water had previously damaged the bathroom subfloors for an extended period of time before leaking through and damaging the ceilings..."[53] Plaintiffs then hired a contractor and plumber to further inspect the premises; both concluded that the cause of the leaking was "[e]ach upstairs bathroom had an iron tub with a small 'tiling flange' that allowed water to seep into the walls and around and in back of the tub."[54] The insurance policy at issued in *Schwartzenfeld* contained similar language as found in Plaintiff's case:

---

[49] *Schwartzenfeld v. Nationwide Mut. Fire Ins. Co.*, No. 296752, 2011 WL 1565466 (Mich. App. Apr. 26, 2011)(unpublished).
[50] *Id.* at *1.
[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *Id.* at *2.

The insurance policy...covers 'accidental direct physical loss to property...caused by the following perils except for losses excluded under Section I-Property Exclusions.' Those property exclusions provided:

3. We do not cover loss to property described in Coverages A and B resulting directly from any of the following:
***
(e) continuous or repeated seepage or leakage of water or steam over a period of time from a...plumbing system that results in deterioration, rust, or wet or dry rot. Continuous or repeated seepage or leakage from, within, or around any shower stall, shower tub, tub installation, or other plumbing fixture, including their walls, ceilings or floors, is also excluded.

If loss caused by water or steam is not otherwise excluded, we will cover the cost of tearing out and replacing any part of the building necessary to repair or replace the system or appliance. We do not cover loss to the system or appliance from which the water or steam escaped.
(f)(1) wear and tear, marring, deterioration;
(2) inherent vice, latent defect, mechanical breakdown,
***
(6) settling, cracking, shrinking, bulging, or expansion of....walls, floors...or ceilings...
***
Under exclusions 3(a) through 3(f) any loss that follows is covered unless it is specifically excluded.[55]

The trial court found the coverage was excluded under the clear and unambiguous language of the policy and the Court of Appeals affirmed.[56] In so holding, the Court reasoned "[a]lthough 'exclusionary clauses in insurance policies are strictly construed in favor of the insured...clear and specific exclusions must be given effect because an insurance company cannot be liable for a risk it did not assume."[57] Further, "[c]overage under a policy is lost if any exclusion in the policy applies to an insured particular claims.[58] Exclusions serve to limit the scope of coverage provided and must

---

[55] *Id*. at *2-4.
[56] *Id*. at *5.
[57] *Id*. (internal citations omitted).
[58] *Id*.

be read with the policy as a whole and independently of every other exclusion."[59] Therefore, "[b]ecause the loss is excluded, the exceptions do not apply."[60]

Here, like *Schwartzenfeld*, Plaintiff's leak was not discovered right away and there was no dispute as to the cause of the leak.   Similarly, the insurance policies contains the terms "continuous or repeated seepage or leakage" and there is an exception for "wear and tear" and "not otherwise excluded."   In addition, the law in Michigan, like Utah, construes ambiguous contracts language in favor of the insured.   Importantly too, the Court of Appeals in Michigan found that the insurance contract was unambiguous and the terms "not otherwise excluded" meant that the exceptions to coverage *only apply if the loss is not "otherwise excluded."*   Based upon this reasoning, Plaintiff's interpretation of Allstate's insurance policy fails because under Exclusion 3, coverage is excluded. Thus, the "wear and tear" exceptions, and the "sudden and accidental loss provisions" do not apply. In addition, Allstate did not assume the risk that Plaintiff was going to leave his cabin unattended for months at a time, just like the insurance company in *Schwartzenfeld* did not assume the risk that a leaky bathroom would take a considerable amount of time to discover.   Rather, the Court finds it is Plaintiff rather than Allstate who was in the best position to assume the risk that a leak might develop if the water was left on.   The Court understands that Plaintiff left the water on in order to prevent the freezing of pipes but again, that is a risk and that is best assumed by the homeowner, not an insurance company.

Similarly, the Oregon Court of Appeals found that Plaintiff was not entitled to relief in a suit involving an insurance policy that again contained language similar to the instant case.   In *Marsh v.*

---

[59] *Id.*
[60] *Id.*

*American Family Insurance*,[61] the Court was not persuaded by Plaintiff's arguments that there was a conflict created in the insurance policy.  Specifically,

> [p]aragraph 6 would provide coverage generally for loss caused by water.  However, paragraph 3 operates to exclude from that coverage loss that is caused by leakage of water *over a period of time*.  Because the policy contains a specific exclusion of water damage caused by the continuous leakage of water from a plumbing system, plaintiffs' loss is not covered, even though other types of damage caused by water are covered.[62]

This reasoning is in line with Allstate's arguments both in their briefs and at oral argument that if the Plaintiff had discovered his loss in a more timely fashion, perhaps there would have been coverage but because Plaintiff's loss was over an extended period of time, the exclusionary language precludes Plaintiff's recovery.  Therefore, like *Marsh*, the exceptions do not apply.

Lastly, as stated above in relation to whether Section 3 is ambiguous, the Court finds Plaintiff's argument that they are only claiming loss for the first few days of water damage to have no effect on the Court's decision based upon the facts of this case.  Because the damage to Plaintiff's cabin was so extensive and was not found for at least 60-70 days, it is difficult if not impossible for the Court to determine exactly what amount of damage would have occurred in the first few hours and days.  In addition, the Court believes the interpretation Plaintiff wishes the Court to make is against the authority cited above both in this District and others that found coverage to be specifically excluded for long-term water damage.  The policy language works to preclude coverage for exactly the type of damage that occurred in this case—water damage that was undiscovered or unattended for an extended period of time regardless of the source.   Therefore, the Court finds as a

---

[61] 231 Or.App. 332 (2009).

[62] *Id.* at 339.  The language of Plaintiff's insurance policy in *Marsh* that are most pertinent to the instant case are as follows:  "Losses Not Covered, 3. Continuous or Repeated Seepage or leakage of water or steam from within a plumbing, heating, air-conditioning or automatic fire protection sprinkler system or from within a household appliance which occurs over a period of weeks, months, or years.  6.  Other Causes of Loss:  b. inherent vice, latent or inherent defect, mechanical break-down; "If any of these cause water or steam to escape from a plumbing, heating, air-conditioning or automatic fire protection sprinkler system or household appliance, we cover loss caused by the water or steam..."

matter of law that the insurance policy is not ambiguous and Allstate did not breach the insurance

contract by failing to cover Plaintiff's loss to his cabin.  Accordingly, the Court finds that Plaintiff is

not entitled to recovery for the loss sustained to the cabin.

### B.  Breach of Duty of Good Faith and Fair Dealing

Plaintiff's Complaint alleges that Allstate breached the implied covenant of good faith and

fair dealing.  Specifically, Plaintiff alleges

> 23.    That the Defendants breached their duty of good faith and fair dealing in refusing
> to cover the losses sustained by the Plaintiff in the aforesaid loss.
> 24.    That the failure of the Defendants to compensate Plaintiff under his insurance
> policy with the Defendants for the losses sustained as set forth above has caused
> this Plaintiff to sustain losses in an amount to be determined.[63]

Under Utah law, "an insurer's 'implied obligation of good faith performance

contemplates, at the very least that the insurer will diligently investigate the facts to enable it to

determine whether a claim is valid, will fairly evaluate the claim, and will thereafter act promptly

and reasonably in rejecting or settling the claim."[64]

Here, the Court finds that Plaintiff's allegations in the Complaint are refuted by the

Court's finding as a matter of law that Allstate did not breach the insurance contract by failing to

compensate Plaintiff for the loss sustained to his cabin because the loss was excluded under the

plain, unambiguous language of the contract.  Moreover, in reviewing the materials, the Court

finds for the reasons stated in the Allstate's Memorandum and Reply in Support of its Motion for

Summary Judgment, Allstate did not act in bad faith or breach the implied covenant of good faith

and fair dealing.   Although Plaintiff believes Allstate should have done more to evaluate

Plaintiff's claim, the Court believes that Allstate's actions were reasonable in light of the facts of

this case.  The damage to Plaintiff's cabin was so extensive and by all accounts occurred over an

---

[63] Compl. at ¶ ¶ 23-24.
[64] *Jones v. Farmers Insurance Exchange*, 2012 UT 52, at ¶ 7, 286 P.3d 301, 304 (Utah 2013).

extended period of time.  It is therefore reasonable that Allstate's representatives who are arguably well-versed in the exclusions contained in Plaintiff's insurance policy acted diligently, reasonably, fairly and promptly in denying Plaintiff's claim.  In so finding, the Court is not persuaded by Plaintiff's arguments and finds that Plaintiff has not adequately carried his burden in refuting Plaintiff's claims in relation to the second cause of action.

Therefore, based on the foregoing, the Court believes that a reasonable jury could not return a verdict in Plaintiff's favor based upon the undisputed facts of this case.

## CONCLUSION & ORDER

For the foregoing reasons, the Court HEREBY ORDERS that:

1)   Allstate's Motion for Summary Judgment[65] is GRANTED.

2)   Plaintiff's Motion for Partial Summary Judgment[66] is DENIED.

3)   The Clerk of Court is directed to close this case.

DATED this 29 September 2015.

_____
Brooke C. Wells
United States Magistrate Judge

---

[65] Docket no. 37.
[66] Docket no. 38.